## METCALF *v.* GILMORE.

A judgment in favor of a plaintiff for sums of money alleged to be his and to have been paid by mistake, is not a bar to a claim of the defendant for other similar sums received by the plaintiff and not paid to the defendant, although the ownership of all the sums depends on a single question of fact which was tried, and on the decision of which the judgment was based.

In such a case, the claim being divisible, an item which the defendant could have presented in recoupment, but which he did not present, is not barred by a judgment against him on the other items which he did present, although the validity of all the items depended upon the single question of fact, on which the plaintiff prevailed.

ASSUMPSIT. Facts found by the court. In the summer of 1854 the plaintiff and the defendant agreed to buy land on joint account

at the sale of the Fort Snelling Reservation, then expected to take place in September of that year, each to furnish $10,000 for that purpose. In pursuance of this agreement, Metcalf delivered to Gilmore $10,000 ($7,000 in gold, $2,900 in Eastern exchange, and $200 in Eastern bank bills), for which Gilmore gave a receipt dated September 19, 1854. Late in September the expected sale was postponed indefinitely. October 2, 1854, Gilmore having $10,000 in gold of his own, which he had commingled with the $7,000 gold furnished by Metcalf, deposited with C. J. Horsman, a banker, $10,000 in gold in his own name, and took three certificates of deposit,—one for $4,000 due in ten days, one for $3,000 due in twenty days, and one for $3,000 due in thirty days,—all payable in gold, and bearing interest from date at the rate of 12 per cent. per annum. On the same day he returned to Metcalf the drafts for $2,900, and October 14, 1854, the $200 in Eastern bank bills, and took home with him the remaining $7,000 in gold. October 13, 1854, the $4,000 certificate became due, and for it he obtained a draft on New York for $4,000, which he forwarded to Metcalf, thus leaving in his or in Horsman's hands $3,000 of the $10,100 for which the receipt of September 19th was given. Before the twenty days' certificate became due, Horsman failed. December 22, 1854, Horsman paid Gilmore $1,500, and in February, 1855, another sum of the same amount by way of dividends on the two unpaid certificates of deposit. April 24, 1855, Gilmore and Horsman settled, adjusting the back interest and premium on gold. Horsman then paid Gilmore $293.54 and gave him his note for $3,000, due in two years with interest at 10 per cent. per annum, secured by a trust deed of real estate, and ante-dated November 2, or November 22, 1854; also his note for $300, but whether ante-dated, and whether on interest, did not appear. For the extension of two years Horsman agreed to pay interest at the rate of 15 per cent. per annum, and the $300 note was given for the excess above 10 per cent. Horsman failed to pay the $3,000 note at maturity, but made payments from time to time until March, 1866, when a final settlement was had, and the balance then agreed upon between Horsman and Gilmore was paid. This was afterwards understood and treated by both Metcalf and Gilmore as a loan of Metcalf's $3,000 by Gilmore to Horsman. Gilmore did not hand over to Metcalf the money received by him from Horsman on the $3,000 note at the times when the several payments were made, but paid him other sums at different times from 1856 to 1866, amounting in the aggregate to less than the sums received by him from Horsman.

Some unsuccessful attempts at settlement were made by Metcalf and Gilmore between 1858 and 1870. In November of the latter year they met in Chicago. Metcalf then claimed that there was due him from Gilmore, August 25, 1866, $2,186.37, to be reduced by the amount of a draft for $1,150, sent by Gilmore to him September 13, 1856. Gilmore, on the other hand, claimed that he had

overpaid Metcalf by $38.65. They did not settle, and Gilmore on the same day sued Metcalf in Chicago for the amount so overpaid. In his specification in that suit, Gilmore credited Metcalf with the $10,100 received September 19, 1854, and charged him with all sums returned and paid to him from the beginning, thus showing a balance of $2,155.32 in favor of Gilmore. Metcalf pleaded the general issue, and filed in set-off the same items which make up his specification in this suit, the first being " April 24, 1855, To cash of Horsman, it being interest, premium on gold, and bonus, $293.54."

The Illinois suit came on for trial March 23, 1877, before a jury. Metcalf was not present. His deposition had been taken, and was forwarded by mail, addressed to his counsel instead of the clerk of the court, and was for that reason rejected. His counsel thereupon withdrew the set-off, and offered no evidence except to cross examine Gilmore, who testified in his own behalf, and a witness called by him. Upon the direct examination of Gilmore, his counsel proposed to inquire in relation to the deposit with Horsman, but the defendant objecting, the evidence was ruled out. Upon cross-examination, Metcalf's counsel was permitted to examine Gilmore in relation to his transactions with Horsman, upon the understanding that he made Gilmore his own witness to that extent. Metcalf's counsel thereupon examined Gilmore in relation to the deposit of $10,000 in gold, October 2, 1854, with Horsman, and as to what payments Horsman had made, and inquired specifically in regard to all except the first item in the set-off in that suit (the first item in the specification in this suit), to wit, the payment of $293.54, April 24, 1855, concerning which no specific inquiries were made. Gilmore had a verdict for $138.65, being the amount of overpayment claimed by him and $100 charged for services, and recovered judgment for said sum as damages and costs.

Upon the trial of the Illinois suit, the fact was in controversy whether Metcalf elected to hold Gilmore liable for the money deposited with Horsman, or treated said loan as his own.

Upon the trial in this case, the evidence was conflicting as to what the payment of April 24, 1855, of $293.54 by Horsman to Gilmore included. The plaintiff contended that it included the sum of $200 " bonus" paid for delay in the payment of the two $3,000 certificates due October 22, and November 2, 1854, and that $93.54 was for back interest and premium on gold. The defendant contended that the whole sum of $293.54 was for back interest and premium on gold. Owing to the lapse of so many years, and to the conflict in the evidence, and to the lack of evidence, it is difficult to determine how the sum of $293.54 was made up, but $98.33 of it was interest and premium on gold reckoned in to make part of the $293.54 on the settlement between Gilmore and Horsman, April 24, 1855, to which Metcalf was entitled on account of the original deposit with Horsman, October 2, 1854, namely:

| Interest on $3,000, 30 days, to November 2, | $30.00 |
| " " $3,000, 20 " to " 22, | 25.00 |
| " " $4,000, 10 " to October 12, | 13.33 |
| Premium on $3,000 gold, | 30.00 |
| | $98.33 |

In Illinois, under the plea of *non assumpsit*, the defendant may recoup, or show matters in defence sufficient to overcome the plaintiff's cause of action, but cannot have any affirmative verdict or judgment in his favor.

Gilmore was cross-examined as to the money received from Horsman, and he was the only witness upon that point. The question was submitted to the jury whether Gilmore was Metcalf's agent in loaning the money to Horsman, or whether Metcalf had elected to treat the money as loaned to Gilmore. The jury were instructed as follows: " If the jury shall find from the evidence that in October, 1854, the plaintiff returned to the defendant all the money of the defendant then in his hands except $3,000, and that that sum was without the consent of the defendant loaned to Horsman in the name of the plaintiff, and that the defendant was informed of such fact, then the defendant had the right to elect either to hold the plaintiff liable for such money, or to take said loan to Horsman and treat it as his own;—and if they shall further find that the defendant did not then elect to affirm such loan to Horsman and accept the same, but did elect to hold the plaintiff liable for the money, he would be bound by such election, and the plaintiff would be liable for the balance of said money, with interest thereon at six per cent. per annum from the time it should have been paid to the defendant, less any sum that might be due from the defendant to the plaintiff without regard to the money he might receive from Horsman."

Mr. Baker, counsel for Gilmore, in his argument to the jury, conceded that if Metcalf was entitled to the money received from Horsman, there had not been an overpayment by Gilmore to Metcalf, and that Gilmore could not recover.

As to the sum of $98.33 above referred to, the court found that the same was in controversy in the Illinois suit, but was not in issue, nor included in the judgment.

A bill of exceptions allowed in the Illinois case, stating the evidence used on the trial there, and the charge of the court to the jury, and other evidence showing the course of that trial, were introduced; also the report of an auditor to whom this case had been previously sent, to which an exception not now material to be stated was taken by the defendant.

*E. L. Cushing, A. S. Wait,* and *H. W. Parker,* for the plaintiff. This action being in New Hampshire, in all that relates to the remedy it will be governed by the law of New Hampshire. Section

13*

905, U. S. Rev. St., reads,—"And the said records and judicial proceedings, so authenticated, shall have such faith and credit given to them in every court within the United States, as they have, by law or usage, in the courts of the state from which they are taken." This is by no means saying that they shall have the same effect. *Weeks* v. *Pearson*, 5 N. H. 324; *Williams* v. *Haines*, 27 Iowa 251; *Hawley* v. *Hunt*, 27 Iowa 303. These are all cases in which the effect of the judgments of sister states is considered, and all illustrating and sustaining what is said by *Dillon*, C. J., in *Williams* v. *Haines*, —" Respecting what shall be good defences to actions in this state, its courts must administer its own laws, and not those of other states."

The plaintiff's declaration contains the general money counts. The specification sets out a special mutual agreement, by which the defendant promised to account for his agency by paying all the money he had received from Horsman, with interest at ten per cent., the plaintiff to assess the same on all payments; and then the account is stated in detail.

The case finds that in all Gilmore did in' reference to the $3,000 note, he was acting as Metcalf's agent. As matter of law, all the sums received from Horsman were Metcalf's money. Gilmore did not pay over to Metcalf the sums received as soon as received. Between 1858 and 1864 he received very considerable sums, in all over $1,700, of which he paid nothing to Metcalf. These sums were Metcalf's money in Gilmore's hands, under an agreement to loan for Metcalf. Holding these sums of Metcalf's money, he was bound in law to account for them with all the profits. Between Metcalf and Gilmore there was no question of interest. It was a question of accounting for profits. If the matter rested on this alone, there could be no possible doubt of the plaintiff's right to recover the amount found by the court. It should also be noticed that the sums credited by the court to Gilmore cannot be the subject of set-off. It was not a question of mutual accounts, but a matter of payment. When one of those sums had passed from Gilmore to Metcalf, it gave no right of action. It was given and received as payment, and always so treated. If an action had been commenced on one of those payments, it would have been a good defence that it was given and received as payment. G. L. c. 227, s. 8; *Ellsworth* v. *Brown*, 55 N. H. 397. The Illinois judgment cannot be filed in set-off, because the right of action did not exist at the time of the commencement of this action. G. L., c. 227; *Ellsworth* v. *Brown*, *supra*. But it is said that the plaintiff cannot recover, because of certain proceedings in Illinois whereby it is alleged that he is estopped.

A comparison of the record in this suit with that in the Illinois suit shows that the causes of action in the two were wholly different. It is true that Metcalf, in his set-off in the Illinois suit, did claim the same sums as claimed in his present suit; but before the jury was impanelled Metcalf's counsel withdrew the set-off, so

that it was as if there had never been any set-off in the action. We repeat this—there was nothing general in the matter litigated. The record shows that there was not a particle of evidence in relation to anything excepting the items specified. So the record shows that the matters tried were not the same. Metcalf went for certain sums of money received from Horsman. Gilmore, ignoring the Horsman matter, said he had received certain money of Metcalf, and overpaid him, and he went for specific items, which on the whole amounted to a small overpayment. But suppose the pleading may be amended (which under the circumstances we do not admit) so that the defendant may avail himself of the estoppel: how would the matter then stand? The rule, as laid down in *King* v. *Chase*, 15 N. H. 9, is stated as follows: "The judgment is conclusive only upon the matter which was directly in issue in the former trial. By the 'matter in issue' is to be understood the matter upon which the plaintiff proceeds by his action, and which the defendant controverts by his pleadings. Facts offered in evidence to establish the matter in issue are not themselves in issue within the meaning of the rule, although they may be controverted on the trial." The illustrations of this rule, as furnished by New Hampshire cases, are found in *Towns* v. *Nims*, 5 N. H. 259, *King* v. *Chase*, *supra*, *Potter* v. *Baker*, 19 N. H. 166, *Vaughan* v. *Morrison*, 55 N. H. 580, *Haynes* v. *Ordway*, 58 N. H. 167, *Sanderson* v. *Peabody*, 58 N. H. 116. In every one of these cases the authority of *Towns* v. *Nims* and *King* v. *Chase* was recognized, and the decision of those cases adopted. In *Towns* v. *Nims*, *Potter* v. *Baker*, and *Vaughan* v. *Morrison*, the distinction between matters in question and matters in issue is recognized. Applying these principles, what is the result? What does the plaintiff in the Illinois suit proceed upon in his action, and what does the defendant controvert in his pleadings? The plaintiff, Gilmore, proceeds upon a balance alleged to be due him on the account annexed to the writ. The record of the judgment shows that he offered no evidence excepting in regard to the items of account. The defendant Metcalf's set-off was withdrawn before the jury was impanelled. Metcalf therefore controverted nothing but the alleged promise. He had pleaded the general issue with notice of set-off, and he withdrew his set-off. It was then as if there had never been any set-off, and nothing but the general issue of *non assumpsit*. He did not attempt any recoupment, but he permitted the plaintiff to go to the jury on his own evidence and nothing else.

But the counsel of Metcalf examined Gilmore in such way as to make him his own witness. What was the effect of that? The only matter in issue was the repayment by Gilmore of what he called a loan or borrowed money. The court said if counsel seeks to avail himself of these profits he makes Gilmore his own witness. The effect of the ruling appears to be this: When the defence is taken up, if counsel for Metcalf states or relies upon any ground of

defence of the nature of this cross-examination, the evidence will be as if he had put it in in defence, and will be open to cross-examination. But the counsel did not go upon or state any such defence, and the plaintiff's counsel did not cross-examine. The evidence was only applicable so far as it related to the plaintiff's case.

The evidence put in and the cross-examination did not then have any bearing on the case other than as affecting the one question of over-payment. The matter in issue on which the plaintiff proceeded was, whether, on the sum of $10,100 which Gilmore received of Metcalf, there had been payments according to the specification made by Gilmore. On this account as stated, was there anything due Gilmore? Were the payments made as set down, and being so made, was there a balance due Gilmore? The matter on which the action proceeded, and which was controverted by the pleading, was, whether the plaintiff, on those items which had been specifically enumerated, had overpaid the defendant. The plaintiff says,— "I had so much of your money: we agreed to settle so and so, and there was a mistake in the computation." That was all which the evidence related to. There was no question of recoupment; and by our law, and for anything that appears, the defendant in that suit was not bound to recoup. If he had litigated that item he would have lost a large portion of it, because it would have been largely more than the plaintiff's verdict.

We claim that the plaintiff is entitled to recover all which the court has found. We also claim that at all events the $98.33 was not litigated at all in the Illinois suit.

There is another view of this question, which is believed to be decisive against this estoppel. The defendant produces, in support of the bar set up, the record of the judgment in Illinois, authenticated pursuant to the act of congress of May 29, 1790, and to U. S. Rev. St., s. 905. But this record not showing what were the matters in issue in that suit, resort is necessarily had to evidence *aliunde*, upon which that question is to be determined.

It is quite true that there is a bill of exceptions certified with the judgment, which, if competent evidence, tends to show some matters which took place on that trial; but the court here have already held that that bill of exceptions only raises a question of fact, and establishes no legal conclusion. Other evidence, purely parol, is also produced upon the trial, and upon it all the facts are found by the court at the trial term, as any other facts are found upon evidence. The matters in issue in the Illinois suit are not, therefore, ascertained by the record of that case as certified, but are ascertained, so far as ascertained at all, by extraneous evidence.

This Illinois judgment, therefore, is not "proved" according to the act of congress of May 26, 1790, and hence is not entitled to full faith and credit here under s. 1, art. 4, of the federal constitution. The record, as authenticated, shows nothing capable of

operating as a bar to this action.  What that Illinois judgment was, in the view of it most favorable to this defendant, is ascertained, not by the record, but only by parol, which is not within the act of congress or of the federal constitution.

It is only such judgments as are capable of being authenticated as prescribed by the act of congress, which are entitled to receive in other states full faith and credit.  *Robinson* v. *Prescott*, 4 N. H. 450 ; *Mahurin* v. *Bickford*, 6 N. H. 567 ; *Warren* v. *Flagg*, 2 Pick. 448 ; Freem. Judg., *s.* 577.

It is true that these authorities relate to judgments incapable of the requisite authentication by reason of the character of the court where rendered ; but the objection is at least as great that the evidence of what is included in the judgment is such as to be incapable of authentication.

The record of the Illinois court, indeed, is capable of being authenticated according to the act of congress, but when so authenticated it proves nothing,—at any rate, nothing capable of furnishing an estoppel to this action.   The act of congress is, " that the records and judicial proceedings," &c., " shall be proved," &c., " by the attestation of the clerk and the seal of the court annexed, together with the certificate," &c., " that the said attestation is in due form." But here the record, when so authenticated, is by itself no bar, because it does not show whether or not the issues tried were the same.    That is ascertained, if at all, by evidence *aliunde*, and of no higher character than parol.    This, surely, can be no such proof as was contemplated by congress in the act of May 26, 1790.

This Illinois judgment being not only not authenticated, but incapable of authentication according to the act of congress, is entitled to no greater faith or credit than a foreign judgment,—*prima facie* evidence, perhaps, but liable to be overhauled and its merits attacked.

Were the law of Illinois different from our own, and the fact properly pleaded and shown in evidence, it could not avail the defendant, for, beyond the faith and credit to be given it as evidence, it is to be treated as a domestic judgment here, and to operate upon the rights of the parties as a judgment in New Hampshire, and not according to the laws of Illinois.   *Armstrong* v. *Carson's Exrs.*, 2 Dall. 302 ; *Mills* v. *Duryee*, 7 Cranch 481 ; *Judkins* v. *Ins. Co.*, 37 N. H. 470 ; *Hampton* v. *M'Connel*, 3 Wheat. 234 ; Sto. Const., *s.* 1313 ; *M'Elmoyle* v. *Cohen*, 13 Pet. 312 ; *Bank* v. *Dalton*, 9 How. 522 ; Sto. Conf. Law, *s.* 609 ; *Bellows*, J., in *Rogers* v. *Odell*, 39 N. H. 452.

*C. R. Morrison* and *Batchelder & Faulkner* (with whom was *F. Baker* of Illinois), for the defendant.  The court having jurisdiction over the cause and the party, the effect of its judgment as a bar is to be determined, not by the laws of this state, but by the laws of Illinois.

By the laws of Illinois either party had a right to spread upon the record by a bill of exceptions the evidence given at the trial. The right was exercised, and the bill of exceptions, including the details of the evidence, after being submitted to the counsel on the other side, was allowed by the court, and ordered to become a part of the record. The motive of the party in doing this cannot be inquired into, but even if the purpose was as now insinuated, it was entirely justifiable. It was the right of the party to have the proceedings of the court established by incontrovertible evidence, with a view to his protection against another suit. The record cannot be impeached as to the evidence and course of trial and the proceedings at the trial, any more than it can be impeached as to the fact of a recovery by Gilmore of the sum stated. The "full credit," which the constitution of the United States requires, is not only to the mere judgment, but to the "judicial proceedings," which must embrace everything in the cause that by the law and practice of the court is made to become a part of the record. Hence, if there were no other proof, everything spread upon the record by the bill of exceptions is to be considered in determining whether the judgment is a bar. This is required by the constitutional provision; and without it, upon general principles, the record itself, as made up by order of the court, should be regarded as most satisfactory evidence of the matters involved and the course of the trial. *Eastman* v. *Cooper*, 15 Pick. 276, 281, 287; *Brackett* v. *Hoitt*, 20 N. H. 257. In addition to the record, it is proved by the testimony on both sides that the evidence in the cause and the instructions to the jury were as stated in the bill of exceptions.

Now upon the record itself, and upon extrinsic evidence consistent with the record, the judgment is a bar,—first, because the subject-matter of the present suit was necessarily involved in the former suit; and second, even if Metcalf had an option, he elected to go into an inquiry as to the money that had been received from Horsman, and he cannot try the question over again.

"The principle of *res adjudicata* embraces not only what has actually been determined in a former case, but also extends to any other matter properly involved, and which might have been raised and determined in it." *Rogers* v. *Higgins*, 57 Ill. 244; *Ashuelot R. R.* v. *Cheshire R. R.*, 59 N. H. 409; *Barker* v. *Cleveland*, 19 Mich. 230.

There is no exception to the rule, that a former judgment is a bar to everything which might have been litigated and decided, and which, if now considered, would involve an inquiry into the merits of the former judgment *Sanderson* v. *Peabody*, 58 N. H. 116, and cases cited; *Barth* v. *Burt*, 43 Barb. 628—*S. C.*, 17 Abb. Pr. 349; *Petersine* v. *Thomas*, 28 Ohio St. 596; *Chesapeake Co.* v. *Gittings*, 36 Md. 276; *Parkhurst* v. *Sumner*, 23 Vt. 538; *Danaher* v. *Prentiss*, 22 Wis. 311; *Phelan* v. *Gardner*, 43 Cal. 306; *Malloney* v. *Horan*, 49 N. Y. 111; *Whitcomb* v. *Williams*, 4 Pick. 228.

That Metcalf might have set up his claim to the Horsman money, as an answer to Gilmore's claim of overpayment, is clear. Certain facts in respect to this money are undisputed. Gilmore received of Metcalf $10,100 in September, 1854. October 2, 1854, he deposited $10,000 in gold in his own name with Horsman. By the middle of October he had returned to Metcalf all but $3,000 and such proportion of the gold premium and back interest on the $10,000 as might belong to Metcalf. The plaintiff's claim in this suit is, that the $3,000 outstanding in Horsman's hands, although deposited in Gilmore's name, was in fact Metcalf's money, and that he was entitled to receive whatever was received from Horsman on account of it. If this assumption is not true, Metcalf, of course, has no claim to the money received from Horsman, and his suit, which is for that money, must fail. If his assumption is true, that the $3,000 is a part of the $10,100, and that consequently he had a right to the money received from Horsman, it cannot be doubted that he might have set up that right as a defence, under the general issue, as an answer to Gilmore's suit. He could have done it, even if the suit had been in our own state. Recoupment, under the general issue, is more liberally allowed in Illinois than here. *Stow* v. *Yarwood*, 14 Ill. 424; *Railroad* v. *Barrett*, 95 Ill. 467; *Waterman* v. *Clark*, 76 Ill. 428; *Streeter* v. *Streeter*, 43 Ill. 155; *Belden* v. *Perkins*, 78 Ill. 449; *Brigham* v. *Hawley*, 17 Ill. 39; *Scott* v. *Kenton*, 81 Ill. 96; *Collins* v. *Thayer*, 74 Ill. 138; *Howell* v. *Goodrich*, 69 Ill. 556; *Turner* v. *Retter*, 58 Ill. 264; *Babcock* v. *Trice*, 18 Ill. 420.

Having a right to set up his claim to the Horsman money under the general issue, he was bound to do it, or take the consequences. The whole basis of Gilmore's claim was, that he had paid to Metcalf the sum which he received of him, and more too, and that the excess was an overpayment by mistake. This claim necessarily covered the original sum and all its legal incidents. It necessarily covered interest upon that sum if he was chargeable with interest, and all profits received on account of it if he was chargeable with such profits, for they were mere incidents of the principal. It was impossible that he had overpaid him, unless he had repaid not only the principal sum, but also all items of interest and profit, from or by reason of it, for which he was liable. The question whether he had overpaid what he was liable for by reason of his reception of the $10,100, inevitably involved the questions whether the $3,000 loaned to Horsman was parcel of the $10,000, whether he was chargeable with the sums received from Horsman, and whether, reckoning the principal sum, and all interest and moneys received on account of it, or any part of it for which he was liable, there was still an overpayment, and that overpayment was by mistake. By no possibility could he be entitled to a verdict in his favor until he had accounted for all incidents of the $10,100 with which he was chargeable, as well as for the principal sum;—and a verdict in

his favor conclusively proves that he had thus accounted. Hence any inquiry as to whether he had thus accounted, necessarily involves an inquiry into the merits of the former judgment. That judgment being correct, it necessarily follows either that Gilmore was not chargeable with the sums received from Horsman, or else that, reckoning those sums, there was still an overpayment. In either view the judgment is a bar.

Suppose the plaintiff here should attempt to show that at the trial at Chicago no interest was reckoned on the $10,100, and to recover it: would the idea be entertained for a moment? But his claim upon the Horsman money cannot stand upon any different footing. He is not entitled to those sums unless they were incidents; and whether they were such, and how they would affect the claim of overpayment, were necessarily involved at the former trial, and Metcalf was not at liberty to forbear inquiry then and set up his claim afterwards.

Where there can be no recovery for anything without proof of due care and skill, a recovery of any sum, however small, is a bar to a suit for negligence, and it will make no difference that the party had expressly withdrawn his plea of negligence for the very purpose of saving his right. *Bellinger* v. *Craigue*, 31 Barb. 534; *Gates* v. *Preston*, 41 N. Y. 113; *Davenport* v. *Holland*, 2 Cush. 1.

At the Chicago trial there could be no recovery for anything without proof by Gilmore that he had paid, and more than paid, the principal sum, and all its incidents, of whatever nature, for which he was chargeable.

If it be suggested that Metcalf's claim was greater than a mere defence, and so he was not bound to interpose it, we say that while a verdict against him would be conclusive upon him, a verdict in his favor would not preclude him from showing how much Gilmore was still indebted to him. There might be a recovery in both suits in his favor, without any conflict. Suppose Gilmore had brought an action upon a special count, alleging that he gave Metcalf a note for a certain sum, and afterwards paid him, and by mistake overpaid him, it could not seriously be claimed that a verdict in Metcalf's favor would estop him from maintaining a suit upon the note. And there is no difference in principle between the case supposed and the one in hand, if Metcalf had recovered a verdict in the Chicago suit. If, having an option whether to set up his claim to the Horsman money in that suit, or bring a separate suit, he had voluntarily set it up in that suit, he would have been precluded by a verdict either way from setting it up afterwards, on the principle stated in *Britton* v. *Turner*, 6 N. H. 481, and recognized in many cases, that a party shall not have his cause of action adjudicated upon piecemeal. But having no option, since the question of overpayment of the principal sum necessarily involved that sum and all its accessories and incidents, he could not be prejudiced by a

verdict in his favor, and therefore would have no legal excuse for not interposing his claim then, so far as it should be necessary to his defence; and the judgment against him would have been a bar even if he had raised no question as to the Horsman money. In the second place, he voluntarily put his right to the Horsman money in issue; and so if he had had any option whether to do it or not he is bound by his election, and barred by the judgment against him.

[In support of this proposition, counsel quoted at length from the Illinois bill of exceptions, and referred to other evidence showing the course of that trial.]

There can be no pretence, therefore, but that the right was actually tried; and it cannot be tried over again in this suit commenced six years after. The defendant here does not need the additional fact that the verdict of the jury, upon the computations of Mr. Brodie, and the admitted facts of the case, could not have been returned for Gilmore, if the jury had found that Metcalf had so conducted as to be entitled to the Horsman money. Upon well settled principles in the state of Illinois, and elsewhere, the judgment would be a bar in that state, and it must be a bar here.

The plaintiff, however, contends that we cannot be permitted to prove this state of things to show the estoppel. Why not? All that is material for us is of record, being contained in the bill of exceptions allowed by the court and ordered to become a part of the record, and which can no more be impeached than any other part of the record. This whole inquiry was gone into under the declaration as it was; and the facts we prove are in no way in conflict with the declaration. The declaration contained the common counts, with an account annexed showing the item of $10,100 received, and the several items of payment. It is entirely consistent with this to prove that the $3,000 mentioned in the specification in the present suit, as money lent to Horsman, was a part of the $10,100. It is true, Metcalf's counsel withdrew their set-off; but having withdrawn it, it was still entirely competent for them to try the right to the Horsman money in order to defeat the suit;—they did so by their persistent cross-examination in respect to it, and by their arguments, and the cause was fully submitted to the jury under proper instructions; and that we say is the end of it. If they withdrew their set-off, they did not withdraw their evidence, and the issue was fought out to the end. The judgment is a bar.

CARPENTER, J. Gilmore, without authority, loaned $3,000 of Metcalf's money to Horsman at 15 per cent. interest. Metcalf subsequently ratified the loan, the full amount of which was ultimately paid to Gilmore, who remitted to Metcalf a little more than the principal sum with 10 per cent. interest. The present suit is brought to recover the difference. In 1870, Gilmore, claiming that Metcalf had not ratified the loan to Horsman, and was therefore

entitled to receive only the sum of $3,000 with interest at 10 per cent., brought a suit against Metcalf in Illinois to recover back about $38 which he had paid to him by mistake, as he alleged, over and above that amount. In his specification he credited Metcalf with $3,000, and charged him with the sums remitted. Metcalf filed a set-off, charging Gilmore with the moneys received of Horsman, and crediting his payments, but subsequently withdrew it, and the case was tried upon the general issue. At the trial Metcalf contended that he had ratified the loan, set up by way of recoupment all the items of money paid by Horsman to Gilmore on account of the loan except the first item in his specification in this suit, and introduced evidence in support of them. Gilmore conceded that if he was liable for the moneys received of Horsman, he was not entitled to recover. The court instructed the jury that if Metcalf did ratify the Horsman loan, or elect to treat it as his own, Gilmore was liable to him for the moneys received of Horsman; otherwise, he was not. The jury returned a verdict for Gilmore, upon which judgment was rendered. In Illinois, under the general issue the defendant may recoup or show matters in defence sufficient to overcome the plaintiff's cause of action, but cannot have any affirmative verdict or judgment in his favor.

Setting up a claim by way of recoupment in answer to an action has substantially the same legal effect as a set-off in jurisdictions where under the statutes of set-off the defendant cannot have judgment for the balance which may be found due to him, as, for example, in England. There, if the judgment is against the set-off, it is a bar to any subsequent suit upon it ( *Eastmure* v. *Laws*, 5 Bing. N. C. 444) ; but if it is in favor of the set-off, the defendant may in a subsequent suit recover the remainder of his demand, if it is divisible, and possibly even though it is indivisible in its nature. *Hennell* v. *Fairlamb*, 3 Esp. 104 ; *Britton* v. *Turner*, 6 N. H, 495. However this may be, if the defendant's demand is divisible, he may plead as a set-off or set up in recoupment so much of it as may be requisite to overbalance his indebtedness to the plaintiff, and maintain an action for the remainder. *Bailey* v. *O'Connor*, 19 N. H. 202 ; *Secor* v. *Sturgis*, 16 N. Y. 548 ; *Millard* v. *Missouri*, K. & T. *Railroad*, 86 N. Y. 441.

Metcalf's claim for the moneys received of Horsman was divisible. Upon the payment by Horsman of each item, a distinct cause of action arose in favor of Metcalf and against Gilmore for the amount of that item. The judgment obtained in Illinois is conclusive that Gilmore does not owe Metcalf the several items which Metcalf in that suit set up in recoupment ; but upon the question whether he owes to Metcalf the item not so set up, it is neither conclusive nor evidence. That part only of Metcalf's claim which he presented and asked to have allowed to him was adjudicated. It is not material that the remainder of his demand depends upon the same evidence which he introduced in that suit. Although a

ratification of the Horsman loan, or the want of it, was the evidence upon which the parties respectively relied to maintain the issue whether Gilmore did or did not owe the moneys set up in recoupment by Metcalf, and the validity of the remainder of Metcalf's claim depends upon the same evidence, it was not the matter in issue within the meaning of the rule as established in this state. The judgment, therefore, does not conclude the parties upon the question of ratification. *King* v. *Chase*, 15 N. H. 9. The distinction is between facts, which, being alleged in pleading, constitute a good cause of action or a good defence, and facts which are merely evidence—between facts which upon the face of the pleadings are essential to be established by one party or the other, and facts which upon the face of the pleadings are immaterial, and become material only by the course of the evidence. A judgment is conclusive upon the parties and privies of such of the former class of facts as are actually tried, but never of any of the latter class of facts, although they may be the only questions litigated. In an action of trover, under a plea of not guilty, the plaintiff's title to the property and its conversion by the defendant are the only facts material upon the face of the pleadings to be established by the plaintiff or to be refuted by the defendant, and of one or both of these facts alone will a judgment in the cause be conclusive upon the parties in a subsequent suit between them upon a different cause of action. If, for example, the action is for the conversion of a horse, nothing could be more immaterial upon the face of the record than whether the defendant was upon the day of the alleged conversion in the village of B; but upon the introduction of evidence by the plaintiff that the defendant hired the horse to drive to A, it becomes apparent that whether or not the defendant drove the horse to B is a question of vital importance, which may turn upon the further question whether or not the defendant was upon that day in the village of B. To establish the fact that he was, the plaintiff may produce as evidence a promissory note, payable to a stranger and indorsed to him, bearing date upon the day in question, and purporting to be signed by the defendant, together with testimony that it was signed by the defendant in the village of B on the day of its date. To this the defendant may answer that the note is a forgery. And so it may happen, much to the surprise of both parties, that at the end of a long trial the only controverted question is whether the note is genuine or a forgery, insomuch that instructions to the jury to return a verdict for the plaintiff or for the defendant, according as they may find that the note is or is not genuine, would be entirely correct, and all that the case called for. Should the defendant prevail, and the plaintiff subsequently bring a suit against him upon the note, the judgment in the former suit would not be a bar, or conclusive that the note was a forgery.

*Wendell* v. *Moulton*, 26 N. H. 41, was a writ of entry. The

defendant claimed title by adverse possession, and prevailed. Upon the trial he introduced as his principal witness the party under whom he claimed, who testified that he entered upon and took possession of the demanded premises in the fall after he became twenty-one years of age; that he was born in 1795; and that he therefore knew that he made the entry in the fall of 1816, nearly twenty-one years prior to an interruption of the possession by the plaintiff. The time of the entry by this witness was the principal question in dispute;—if it was made in 1816 the defendant, if in 1817 the plaintiff, was entitled to the verdict. The witness was mistaken: he was born in 1796, and made his entry in 1817. Had the age of the witness been the sole question upon which the issue ultimately turned, and the only one submitted to the jury, as it might have been, the judgment would not have concluded the plaintiff, in a subsequent suit for the possession of other lands claimed by the defendant under the same title and by virtue of the same entry, from proving that the witness was born in 1796, as the record of his birth, afterwards discovered, showed was the fact, nor from otherwise proving that the entry was made in 1817.

These examples serve as illustrations, both of the rule as it prevails in this state, and of the reason for it. The doctrine of the conclusiveness of a judgment rests upon the consideration that the parties have once had a full and fair trial of the matter sought to be drawn a second time in question. One of the elements essential to such a trial is, that they have reasonable notice of the question to be tried, and an opportunity to obtain and present all the evidence bearing upon it. Under the rules of pleading and practice, framed to the end that the final investigation of the issues may result in the exposure of error and in the ascertainment of truth, the parties have such notice of all questions which arise upon the face of the pleadings, and ample time to search for and to produce the evidence respecting them. It is not so with matters of evidence: they may not, and from the nature of the case often cannot, receive that searching and exhaustive scrutiny which is given to matters directly in issue. A party may not be, and ordinarily is not, informed in advance of the testimony of his adversary, and hence may not foresee the effect of his own evidence when it comes to be collated with it. Evidence which when introduced is conceded to be true, and seems decisive, may be met and overturned by other evidence in the nature of a confession and avoidance, which in like manner may in its turn be met and overthrown. Had the plaintiff, in *Wendell* v. *Moulton*, seasonably discovered the record of the witness's birth and put it in evidence, the defendant might have replied that it was a forgery. It happens not unfrequently that a cause finally turns upon the existence or non-existence of a particular fact of which neither party at the outset had any knowledge or suspicion. The plaintiff, in the first case used as an illustration, might not anticipate that the defend-

ant would assert the note to be a forgery; nor the defendant, in the other case, that the plaintiff could, had time been given him, demonstrate by the record of the witness's birth that he was mistaken. In neither case could time or opportunity be given during the progress of the trial to investigate those matters: upon them there was not and could not be that full and fair trial which lies at the foundation of the doctrine that a judgment is conclusive between the parties of the facts adjudicated by it. It would be unjust to hold that the plaintiff in the one case was forever precluded from showing that the note was genuine, or the defendant in the other from showing the actual date of the entry by the witness. If they were the only questions of fact ultimately in controversy and submitted to the jury, they were not the questions which the parties set out to try, or which in a legal sense they did try. 1 Gr. Ev., *s.* 528.

There are doubtless many cases where each party knows in advance the evidence to be adduced by the other, and that the cause must turn upon the effect or validity of that evidence. In *King* v. *Chase* both parties probably understood from the beginning that their rights depended upon the validity of the mortgage. In such cases no wrong would be done by holding the judgment conclusive upon the question actually tried. But a rule that a judgment is conclusive of a fact, in case it appears clearly that the cause turned exclusively upon it, and that it was after due notice to the parties fully tried, would be impracticable of application. In many instances it would be more difficult to ascertain whether the case fell within the rule, than to determine the principal cause on trial. For these reasons, among others, it was that the court in *King* v. *Chase* (which has become a leading case, and is believed to be in accord with the weight of authority) established the doctrine, for this state at least, that a judgment is conclusive only upon the matter which was directly in issue upon the former trial, and that the matter in issue within the meaning of the rule is that matter upon which the plaintiff proceeds by his action, and which the defendant controverts by his pleadings. This rule is recommended by its simplicity, definiteness, and comparative ease of application, as well as by the justice of its operation.

There is a difference sometimes overlooked between the effect of a judgment as a bar to the prosecution of a second action for the same cause, and its effect as an estoppel in another suit between the same parties upon a different cause of action. In the former case, a judgment on the merits is an absolute bar to a subsequent action: it concludes the parties, not only as to every matter which was offered and received to sustain or to defeat the suit, but also as to any other matter which might have been offered for that purpose. But in the latter case, the judgment in the prior action operates as an estoppel only as to those matters which were then directly in issue, and either admitted by the pleadings or actually

tried.   *Cromwell* v. *County of Sac*, 94 U. S. 351 ; *Howlett* v. *Tarte*, 10 C. B. N. S. 813.

The position, that the effect of the judgment must be determined by the laws of Illinois, has not been pressed, and cannot be sustained.   Congress, if it has the power to do so, has not provided that a judgment, when offered in evidence or pleaded in bar in a suit between the same parties, but upon a different cause of action in another state, shall have the same effect as would be given it in the state where it was rendered.   U. S. Rev. St., s. 905; Sto. Const., s. 1307 ; Sto. Conf. Law, s. 609 ; *M'Elmoyle* v. *Cohen*, 13 Pet. 312; *Bank* v. *Dalton*, 9 How. 522, 528 ; *Wilbur* v. *Abbot*, 60 N. H. 40.

The plaintiff is entitled to judgment for the amount due upon the first item of his specification, $98.33, with interest at 6 ·per cent. from April 24, 1855.

*Judgment for the plaintiff.*

SMITH, J., did not sit : the others concurred.